J-A35006-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| COMMONWEALTH OF PENNSYLVANIA, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| TRACY MEDLEN, | |
| Appellant | No. 344 WDA 2014 |

Appeal from the Judgment of Sentence Entered January 27, 2014
In the Court of Common Pleas of Washington County
Criminal Division at No(s): CP-63-CR-0000328-2013

BEFORE:  BENDER, P.J.E., SHOGAN, J., and MUSMANNO, J.

MEMORANDUM BY BENDER, P.J.E.:              **FILED FEBRUARY 05, 2016**

Appellant, Tracy Medlen, appeals from the judgment of sentence of 20-40 years' incarceration, following his conviction for attempted murder and related offenses.  Herein, Appellant presents multiple challenges to the trial court's evidentiary rulings and jury instructions.  He also asserts that the prosecutor engaged in prosecutorial misconduct while cross-examining him, and during the Commonwealth's closing arguments.  After careful review, we affirm.

The trial court summarized the facts adduced at trial as follows:

On or about January 17, 2013, [Appellant] was arrested and charged with various offenses stemming from conduct that occurred on December 29, 2012.

During the trial, the jury heard evidence that the police were called in response to a 911 call that a man, Brandon Sarasnick, (hereinafter referred to as "Victim") had been stabbed at the Lincoln Terrace apartments.  By [Appellant]'s own

admission, he testified he deliberately stabbed the Victim and thereafter formulated a false alibi defense. Accordingly, the principal question for the jury was whether [Appellant] had the specific intent required to convict him of Attempted Homicide.

Ms. Tori[] Thomas testified that she was introduced to [Appellant] a few weeks prior to the incident as the boyfriend of her cousin, Shelissa Chandler, a co-defendant in the instant matter. Ms. Thomas testified that when she met the Defendant she noticed that he had a tattoo spelling "CUT" across his neck.

Testimony demonstrated that on the morning of December 29, 2013, Ms. Chandler was staying at Ms. Thomas' apartment when she received a phone call from [Appellant]. [Appellant] informed Ms. Chandler that his mother had passed away that morning and asked Ms. Chandler for a ride. Ms. Chandler refused to provide him with a ride and they began to argue.

Later that day, Ms. Thomas arrived at Pickles Bar where she saw [Appellant]. Ms. Chandler subsequently arrived at Pickles Bar and communicated to Ms. Thomas that she was going to instigate an argument with [Appellant].

The [V]ictim … testified that on December 29, 2012, he went to Pickles Bar alone. At the bar, he joined two males and a female shooting pool. While he was shooting pool, Ms. Chandler approached the Victim and exchanged pleasantries.

Thereafter, the Victim rode to the Cozy Corner Bar with the group of people with whom he had been shooting pool. While at the Cozy Corner, Ms. Chandler re-approached the Victim and engaged in conversation with him before offering to ride him home. The Victim agreed and Ms. Chandler drove the Victim, Ms. Thomas and Ms. Thomas' sister home from the bar. While en route, Ms. Chandler told the Victim that she wanted to make a stop to smoke marijuana at Ms. Thomas' apartment. The Victim stated that he just wanted to go home and that he does not smoke marijuana. Ms. Chandler ignored Victim's request and drove to the Lincoln Terrace apartments where Ms. Thomas resided.

While the Victim and others were talking in Ms. Thomas' kitchen, [Appellant] walked in and sat down. Testimony demonstrated that [Appellant] was eating cereal at the kitchen table when he began yelling and shouting profanities directed toward Ms. Thomas and Ms. Chandler. The Victim left the kitchen

and went into the living room by himself. [Appellant]'s yelling persisted and Ms. Thomas directed everyone to leave her apartment, as her children were asleep upstairs. At this juncture, the Victim proceeded to walk back through the kitchen to exit through the rear kitchen door. Suddenly, [Appellant] got up and grabbed a steak knife. He approached the Victim and put one arm around Victim and held the steak knife in the other hand. The Victim then removed [Appellant]'s hand from his shoulder and exited the apartment through the rear door of the kitchen. Ms. Chandler followed the Victim, exiting the apartment. Ms. Thomas testified that [Appellant] was instigating the event and that the Victim did not try to engage in a fight or argument with [Appellant].

After the Victim exited Ms. Thomas' apartment, he walked toward Ms. Chandler's car. Ms. Thomas testified that at this point [Appellant] pursued the Victim with the knife in hand. Testimony demonstrated that Ms. Thomas began screaming "He's coming. He has that knife. He is coming." The Victim was standing near the rear of the passenger side of Ms. Chandler's car when he heard Ms. Thomas screaming. The Victim turned around and witnessed [Appellant] walking aggressively toward him. The Victim then put his hands up in front of his face in order to defend himself. Testimony demonstrated that [Appellant] lunged at Victim with the knife and stabbed him in the chest. The Victim fell onto the trunk of the car and began screaming that he could not breathe. [Appellant] walked away and knocked on Ms. Bre Ann Watts' door. The Victim then began banging on the passenger side of Ms. Chandler's car and asked her to ride him to the hospital. However, Ms. Chandler would not unlock the door. [Appellant] then reapproached the Victim and flinched at him before entering Ms. Chandler's now unlocked passenger door. [Appellant] entered the car and he and Ms. Chandler drove away from the scene.

The Victim then began walking around and looking for aid. Ms. Thomas testified that she went outside to assist the Victim. She began throwing snow on the wound to help stop the bleeding and then ran to various neighbors' homes to find help. Ms. Rashea Watts and Bre Ann Watts came to their door. After being alerted by Ms. Thomas that the Victim had been stabbed, they came outside and called the police. Ms. Watts, concerned that the Victim could not wait for an ambulance because he was pale, bleeding profusely and going in and out of consciousness, drove the Victim to Washington Hospital in her car.

- 3 -

Officer Jonathon Steiner testified that he received a call at approximately 2:30 a.m. on December 29, 2012, that a male had been stabbed at Lincoln Terrace apartments. When Officer Steiner arrived at the scene, he observed Ms. Thomas visibly shaken. She initially informed Officer Steiner that the Victim was stabbed outside, but that she did not know what happened, failing to disclose any further information for her own safety. Later, however, Ms. Thomas disclosed that she witnessed the totality of the event including identifying [Appellant] as a tall white male with the tattoo "CUT" across his neck.

The Victim was taken to Washington Hospital and then was immediately Lifeflighted to [U.P.M.C.] Presbyterian Hospital [in] Pittsburgh[,] where he underwent surgery. He had suffered a collapsed lung and was treated for a week and a half before being discharged. The Victim later returned to Presbyterian Hospital for a second surgery.

Trial Court Opinion (TCO), 12/3/14, at 4-8 (footnotes omitted).

On September 19, 2013, following a jury trial, Appellant was convicted of attempted murder,[1] aggravated assault (AA),[2] and recklessly endangering another person (REAP).[3] On January 27, 2014, the trial court sentenced Appellant to 20-40 years' incarceration for attempted murder, and to no further penalty for AA and REAP. Appellant filed a timely notice of appeal on February 26, 2014, and a timely, court-ordered Pa.R.A.P. 1925(b) statement on August 14, 2014. The trial court issued its Rule 1925(a) opinion on December 3, 2014.

Appellant now presents the following questions for our review:

[1] 18 Pa.C.S. §§ 901, 2502.

[2] 18 Pa.C.S. § 2702(a)(1).

[3] 18 Pa.C.S. § 2705.

- 4 -

1. Whether the [trial c]ourt made reversible error by allowing the admission of several tape recordings of jail phone calls, specifically #664393, 664517, 671415, 672680[?]

2. Whether the [trial c]ourt made reversible error by allowing Detective Rush to interpret the significance of each jail phone call, which resulted in prejudice to [Appellant?]

3. Whether the [trial c]ourt made reversible error by allowing Deputy Warden Strawn to testify that the phone call recordings were compiled after previous Defense Counsel filed an alibi defense and subpoenaed the recordings[?]

4. Whether, during the cross examination of [Appellant], the [trial c]ourt made reversible error by overruling Defense Counsel's objections to the harassing, confrontational nature of the [prosecutor]'s questioning[?]

5. Whether the [trial c]ourt made reversible error in failing to give a corrective instruction when, in his closing statement, the [prosecutor] stated, incorrectly, that both Tori Thomas and Brandon Sarasnick testified that [Appellant] did not knock on any doors after the stabbing[?]

6. Whether the [trial c]ourt made re[v]ersible error in failing to give a corrective instruction when, in his closing statement, the [prosecutor] incorrectly stated the Defense had presented the position that [Appellant] would be innocent of homicide if the victim had died[?]

7. Whether the [trial c]ourt made reversible error in giving the jury the instruction that there was no question that they could apply the inference of specific intent, with regard to attempted homicide, because a deadly weapon had been used on a vital part of the victim's body[?]

8. Whether the [trial c]ourt made reversible error at the time of sentencing, by allowing the prosecution to play a video recording of an altercation at the jail, which involved [Appellant] and occurred after the guilty verdict in this matter[?]

Appellant's Brief, at 7 (citations to the record omitted).

### *Appellant's jail phone calls*

Appellant's first claim concerns the admission of recordings of his phone calls from jail.

"Admission of evidence is within the sound discretion of the trial court and will be reversed only upon a showing that the trial court clearly abused its discretion." **Commonwealth v. Drumheller**, 570 Pa. 117, 135, 808 A.2d 893, 904 (2002), *cert. denied*, 539 U.S. 919, 123 S.Ct. 2284, 156 L.Ed.2d 137 (2003) (quoting **Commonwealth v. Stallworth**, 566 Pa. 349, 363, 781 A.2d 110, 117 (2001)); **Commonwealth v. Collins**, 70 A.3d 1245, 1251 (Pa. Super. 2013). "An abuse of discretion is not merely an error of judgment, but is rather the overriding or misapplication of the law, or the exercise of judgment that is manifestly unreasonable, or the result of bias, prejudice, ill-will or partiality, as shown by the evidence of record." **Commonwealth v. Harris**, 884 A.2d 920, 924 (Pa. Super. 2005), *appeal denied*, 593 Pa. 726, 928 A.2d 1289 (2007).

**Commonwealth v. Tyson**, 119 A.3d 353, 357-58 (Pa. Super. 2015) (*en banc*).

Appellant presents specific arguments with respect to each of four recordings played before the jury. However, his arguments generally challenge the relevance of the admitted jail phone call recordings, as well as their potential for undue prejudice. In this regard, the following standards apply: "All relevant evidence is admissible, except as otherwise provided by law. Evidence that is not relevant is not admissible." Pa.R.E. 402. Evidence is relevant if "(a) it has any tendency to make a fact more or less probable than it would be without the evidence;" and "(b) the fact is of consequence in determining the action." Pa.R.E. 401. The comment to Rule 401 also directs that: "Whether evidence has a tendency to make a given fact more or less probable is to be determined by the court in the light of reason,

- 6 -

experience, scientific principles and the other testimony offered in the case." *Id.* (comment). "The court may exclude relevant evidence if its probative value is outweighed by a danger of one or more of the following: unfair prejudice, confusing the issues, misleading the jury, undue delay, wasting time, or needlessly presenting cumulative evidence." Pa.R.E. 403.

The trial court states that, in general, the recordings were admitted to establish that Appellant "was making false statements" and "fabricating a defense." TCO, at 9. Thus, the court admitted this evidence as demonstrative of Appellant's consciousness of guilt. Additionally, the court indicates that the recordings "confirmed that [Appellant] was an actor at the scene of the crime[,]" which was "of vital importance as [Appellant] initially intended to present an alibi defense." *Id.*

The first recording at issue was designated as #664393. Appellant's argument with regard to this recording is, in its entirety, as follows:

> Recording #664393 is a phone conversation from January 29, 2013 in which a person purported as being [Appellant] stated that he thought everything was "taken care of," and Tori Thomas wasn't going to show up at his hearing. He stated that "dude" isn't a problem, but Tori is. Since Ms. Thomas did testify, there is no reason for the prosecution to explain her absence. Similarly, [the Victim] identified [Appellant] in his testimony before this tape was played. The evidence was not offered to rebut any previous testimony and it contained no evidence that had a tendency to make a consequential fact more or less probable. The prejudicial effect of this hearsay evidence outweighed its relevance and it should have been excluded.

Appellant's Brief, at 13.

Appellant's single paragraph argument regarding recording #664393 raises three distinct claims. First, that the recording was not relevant evidence; second, that the recording was more prejudicial than probative; and third, that the recording was hearsay.

As to relevance, we agree with the Commonwealth that this evidence was relevant to demonstrate Appellant's consciousness of guilt. Recording #664393 suggests that Appellant was engaged in some effort to prevent or discourage Tori Thomas from testifying against him. *See Commonwealth v. Petro*, 176 A. 46, 48 (Pa. Super. 1934) ("[T]he [C]ommonwealth may show an attempt by the defendant to intimidate its witnesses."). The fact that Ms. Thomas ultimately did testify speaks only to Appellant's lack of success in that endeavor, not to his consciousness of guilt. *See Cover v. Commonwealth*, 8 A. 196, 198 (Pa. 1887) ("It is always admissible to show that the defendant has *attempted* to destroy testimony tending to prove his own guilt.") (emphasis added). Appellant cites no case law suggesting that consciousness-of-guilt evidence is only relevant for rebuttal purposes. Thus, Appellant's claim that recording #664393 was not relevant evidence lacks merit.

Appellant also complains that recording #664393 was prejudicial, but fails to explain why. Elsewhere, Appellant does argue that all of the recordings were prejudicial because of foul language. However, Appellant does not specifically argue that recording #664393 contained such language. In any event, Appellant fails to cite to any case law suggesting that the

presence of foul language is grounds for excluding evidence as unduly prejudicial. Accordingly, this aspect of Appellant's claim is also without merit.

Finally, Appellant's suggestion that recording #664393 was excludable hearsay evidence was not raised before the trial court. N.T., 9/16/13-9/19/13, at 167-168. Accordingly, it is waived. *See* Pa.R.A.P. 302(a) ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). In any event, even if Appellant preserved such a claim, it clearly would lack merit. Appellant's out-of-court statements are not barred as inadmissible hearsay because they fall within the opposing party's statement exception to the hearsay rule. *See* Pa.R.E. 803(25). Accordingly, we ascertain no abuse of discretion in the trial court's admitting recording #664393.

The second recording at issue was designated as #664517. Appellant's argument with regard to this recording is, in its entirety, as follows:

> Recording #664517 is a phone conversation from January 30, 2013 about what [Appellant]'s defense should be. An unidentified man instructs [Appellant] to find loop holes, like self-defense or crime-of-passion. They speculate about whether the death of [Appellant]'s mother could be used as a mitigating circumstance. The recording does not contain admissions of guilt. The recording was played prior to [Appellant]'s testimony. The defense did not present an alibi defense at trial. The Commonwealth cannot, therefore, argue that the recording was any sort of rebuttal. The prejudicial effect of this hearsay evidence outweighed its relevance and it should have been excluded.

Appellant's Brief, at 13.

The essence of Appellant's argument appears to be that his consideration of numerous, potentially incompatible defenses was only relevant if raised to rebut an alibi defense at trial.[4] We find Appellant's contention unconvincing. Appellant does not develop any argument, or present any case law, suggesting that his consideration of multiple and arguably incompatible defenses was not properly considered admissible as consciousness-of-guilt evidence in the Commonwealth's case-in-chief. Nor does he develop any argument, or cite to any case law, suggesting that consideration of numerous conflicting defense strategies was only admissible as evidence of consciousness of guilt if that evidence was offered in rebuttal to an alibi defense actually presented at trial. Indeed, our own review of relevant case law fails to uncover any such proscriptions. Certainly, evidence of a defendant's consideration of incompatible defenses will often be inadmissible when protected by attorney-client privilege; but no such privilege-based bar to otherwise relevant evidence is at issue here. Given Appellant's failure to articulate, with supporting authority, the reason why this evidence was irrelevant, this aspect of his claim regarding recording #664517 lacks merit.

_____

[4] It is true that Appellant did not ultimately present an alibi defense at trial; however, he did issue notice of an alibi defense prior to trial. Subsequently, following a change of counsel, Appellant's alibi defense was abandoned.

As to whether recording #664517 was hearsay, this argument is wholly undeveloped and, in any event, it has been waived. Pa.R.A.P. 302(a). Appellant did not object to recording #664517 on hearsay grounds at trial. Additionally, as noted above, if such a claim had been preserved, it would be meritless because Appellant's own statements are generally not barred by the hearsay rule. Moreover, Appellant's only objection at trial regarding the prejudicial nature of recording #664517 was with regard to discussions contained therein pertaining to his consideration of entering a guilty plea. *See* N.T., 9/16/13-9/19/13, at 170. The trial court agreed to redact any plea-related discussions. *Id.* Thus, we ascertain no abuse of discretion in the trial court's admitting recording #664517.

The third recording at issue was designated as #671415. Appellant's argument with regard to this recording is, in its entirety, as follows:

> Recording #671415 is a phone conversation from March 5, 2013 in which a person identified by the prosecution as [Appellant] instructs a person purported as being Ms. Chandler to have a friend write a letter to him apologizing and affirming that her testimony is coerced by police threats. Ms. Chandler was never called to testify. Aside from the obvious effect of crude language, this evidence prejudices the jury against [Appellant] by painting him as a conniving, desperate man. It does not, however, tend to prove any fact in question. The prejudicial effect of this hearsay evidence outweighed its relevance and it should have been excluded.

Appellant's Brief, at 13.

Our review of the record indicates that Appellant did not specifically object to the admission of recording #671415 on any grounds. *See* N.T.,

9/16/13-9/19/13, at 172-74. Accordingly, this matter has been waived. Pa.R.A.P. 302(a).

The final recording at issue was designated as #672680. Appellant's argument with regard to this recording is, in its entirety, as follows:

> Recording #672680 is a phone conversation from March 11, 2013 in which a person purported as being [Appellant] claims to not having been involved in the assault and that there is a mistake in identification. He states that it only matters what "they" can prove and that "shorty" needs to say it wasn't him. This, again, may have been proper only as rebuttal evidence. Since it was not used as such, it was inadmissible. The prejudicial effect of this hearsay evidence outweighed its relevance and it should have been excluded.

Appellant's Brief, at 13.

For the same reasons discussed above with respect to recordings #664393 and #664517, we ascertain no abuse of discretion in the trial court's admission of recording #672680.

### *Detective Rush's interpretations of Appellant's jail phone calls*

In his second claim of error, Appellant contends that the trial court erred by allowing a police officer to "interpret" the aforementioned recordings of Appellant's jail phone calls. Detective Daniel Rush of the City of Washington Police Department was the lead investigator in the instant case. As part of discovery, the defense requested any jail phone call recordings made by Appellant. Detective Rush, in conjunction with Deputy Warden Strawn of the Washington County Jail, compiled and reviewed those recordings. N.T., 9/16/13-9/19/13, at 157. The recordings were admitted during the course of Detective Rush's testimony. When Detective Rush was

asked by the prosecutor about the significance of a particular recording, Appellant objected as follows:

> Objection, your honor. I think, again, it's improper for the police officer to interpret to the jury what they just heard. If they're concerned about the jury not being able to understand or hear, transcripts could be produced of the call. It's improper for an interpretation from the detective as to what the jury just heard.

*Id.* at 197.

In response, the prosecutor argued that the jury was free to accept or reject Detective Rush's interpretation of the recordings. *Id.* at 197-198. The trial court disagreed, and instructed the prosecutor, "You can ask did something draw your attention or what significance it is in your investigation, but to have him interpret that, that's the jury's function." *Id.* at 198. The prosecutor then asked Detective Rush, "What significance is that to your investigation?" *Id.* No further objections were lodged by Appellant.

Appellant contends Detective Rush's "interpretations" prejudiced him. However, it is clear that following Appellant's objection, the trial court directed the prosecutor to reframe his questioning in line with Appellant's objection. When the prosecutor did so, Appellant issued no further objections. Thus, the trial court effectively sustained Appellant's objection, and Appellant did not subsequently complain that the court's instructions were insufficient to remedy his concern, nor did he request a mistrial when Detective Rush answered the reframed question. Accordingly, we ascertain

no abuse of discretion in the trial court's treatment of Appellant's objection, and conclude, therefore, that Appellant's second claim lacks merit.

### References to Appellant's pre-trial alibi notice

Appellant's third claim concerns the testimony of Deputy Warden Strawn, who testified that the aforementioned recordings had been compiled in response to Appellant's pre-trial alibi notice. Appellant objected that the reference to the alibi motion was irrelevant and prejudicial because he had stipulated to the authenticity of the recordings. The trial court overruled the objection. N.T., 9/16/13-9/19/13, at 188-89. In its opinion, the trial court states:

> Deputy Warden Strawn testified that he oversees that daily operation of the Washington County Correctional Facility including the monitoring and recording of all inmate telephone calls. The Deputy Warden's testimony was relevant as it showed when the calls were received by [Appellant], and by whom the calls were made. The testimony simply demonstrated the chronology and development of the foundation for the introduction of [Appellant]'s statements made during the recorded calls.

TCO, at 14.

In addition, as discussed above, evidence of Appellant's giving an alibi notice was also relevant to his consciousness of guilt. Thus, Appellant's claim that Deputy Warden Strawn's reference to the same was irrelevant is meritless. As to the prejudicial nature of that evidence, we note that the record demonstrates that the mentioning of Appellant's alibi notice by Deputy Warden Strawn was, as the trial court indicates, only made for the purpose of establishing the chronology of the conversations heard on the

recordings. Deputy Warden Strawn did not in any way opine at length regarding the nature or merits of Appellant's alibi notice.

Moreover, Appellant fails to offer any supporting case law for his argument that such evidence is unduly prejudicial. Appellant references Pa.R.Crim.P. 567(F) to support his claim, but that Rule is, at best, not germane to his argument and, at worst, may actually serve to undermine his claim.

Rule 567 sets forth the rules governing alibi defense notices. Subsection F dictates:

> **(F) Failure to Call Witnesses.** No adverse inference may be drawn against the defendant, nor may any comment be made concerning the defendant's failure to call available alibi witnesses, when such witnesses have been prevented from testifying *by reason of this rule*, unless the defendant or the defendant's attorney shall attempt to explain such failure to the jury.

Pa.R.Crim.P. 567(F) (emphasis added).

Thus, while Rule 567(F) does proscribe references to a defendant's failure to call "available" alibi witnesses, it only does so when such witnesses fail to testify "by reason of" Rule 567. For instance, Rule 567(B) states:

> **(B) Failure to File Notice.**
>
> (1) If the defendant fails to file and serve the notice of alibi as required by this rule, the court may exclude entirely any evidence offered by the defendant for the purpose of proving the defense, except testimony by the defendant, may grant a continuance to enable the Commonwealth to investigate such evidence, or may make such other order as the interests of justice require.

(2) If the defendant omits any witness from the notice of alibi, the court at trial may exclude the testimony of the omitted witness, may grant a continuance to enable the Commonwealth to investigate the witness, or may make such other order as the interests of justice require.

Pa.R.Crim.P. 567(B).

Thus, Rule 567(F) implicitly suggests that references to a defendant's failure to call an alibi witnesses may be made by the prosecution when that witness' testimony was not presented at trial for reasons other than Appellant's failure to comply with the notice requirements of Rule 567. Appellant concedes that he was not prevented from calling an alibi witness by operation of Rule 567. Appellant's Brief, at 16. Nevertheless, Appellant believes the "spirit of this rule still applies." *Id.* Appellant simply misunderstands the nature and purpose of this rule. Rule 567(F) does not set forth a general policy disfavoring references to abandoned alibi defenses. Instead, it serves to correct potential, unfair prejudice, which might arise when a defendant has been prevented from offering an alibi witness at trial due to that defendant's failure to properly comply with the notice requirements set forth in Rule 567. Thus, Rule 567(F) operates to protect a defendant who wishes to offer an alibi witness, but cannot do so due to a procedural bar. It would be extremely unfair for a prosecutor to comment adversely on a defendant's failure to call an alibi witness when the alibi witness is both available and willing to testify but procedurally barred from doing so. Rule 567 does not serve to protect a defendant from any mention of an abandoned alibi defense when that defendant has abandoned that

defense altogether for strategic or substantive reasons. Thus, we ascertain no prejudice in the mentioning of Appellant's alibi notice based on the "spirit" of Rule 567(F). Accordingly, we conclude that the trial court did not abuse its discretion when it permitted Deputy Warden Strawn to briefly reference Appellant's pre-trial alibi notice.

### Prosecutorial misconduct during cross-examination

Next, Appellant contends the prosecutor engaged in a course of prosecutorial misconduct while cross-examining him. Appellant complains that the prosecutor's questions were "harassing" and "confrontational [in] nature[.]" Appellant's Brief, at 17.

Appellant does not cite to any specific objection he made, or specific conduct by the prosecutor which he finds particularly egregious. Instead, Appellant directs our attention to a span of more than 30 pages in the trial transcript. Appellant's Brief, at 17 (citing N.T., 9/16/13-9/19/13, at 239-73). Our review of that portion of the record does indicate that the cross-examination of Appellant was contentious. Numerous objections were lodged by defense counsel for a variety of reasons. Some of these objections were overruled, and some were sustained. Often, the trial court effectively sustained Appellant's objections by directing the prosecutor to rephrase his questions in order to comport with defense counsel's objection. As to any specific objection, such matters are waived, as Appellant did not properly preserve any particular objection in his Pa.R.A.P. 1925(b) statement. *Commonwealth v. Lord*, 719 A.2d 306, 309 (Pa. 1998) ("Any

- 17 -

issues not raised in a 1925(b) statement will be deemed waived."). In any event, we deem any claim based on a particular objection as meritless because Appellant has failed to meaningfully develop such a claim for our review. "[W]here an appellate brief fails to provide any discussion of a claim with citation to relevant authority or fails to develop the issue in any other meaningful fashion capable of review, that claim is waived." *Commonwealth v. Johnson*, 985 A.2d 915, 924 (Pa. 2009).

Appellant does appear to be arguing that the prosecutor engaged in pattern of behavior that constituted prosecutorial misconduct, regardless of the resolution of any complaint about a particular comment or question made during the cross-examination of Appellant. *See* Appellant's Brief, at 17 ("There was a total disregard for the solemnity of the court and an anything-goes attitude with regard to cross-examination."). However, it is well-settled that no number of failed individual prosecutorial misconduct claims can attain merit collectively. *See Commonwealth v. Culver*, 51 A.3d 866, 882 (Pa. Super. 2012). Accordingly, we conclude that Appellant's fourth claim of error is waived and/or meritless.

### *Prosecutorial misconduct during closing argument – mischaracterization of testimony*

Next, Appellant claims that the trial court erred when it failed to issue a specific corrective instruction to the jury after the prosecutor ostensibly misconstrued the nature of the testimony of the Victim and Tori Thomas. Appellant contends that, during closing remarks, the prosecutor incorrectly

stated that the Victim and Thomas testified that Appellant did not knock on any doors after the stabbing. He argues that "the [prosecutor]'s mischaracterization of this testimony caused prejudice to [Appellant] and the [c]ourt erred in declining to give a detailed curative instruction to the jury." Appellant's Brief, at 18.

Appellant testified that he knocked on several doors following the stabbing in an attempt to obtain help for the Victim. N.T., 9/16/13-9/19/13, at 231. Appellant believes his testimony demonstrated that he lacked the specific intent to kill the Victim, the core theory of his defense to the charge of attempted murder. Appellant believes the prosecutor misconstrued the testimony of Ms. Thomas and the Victim because: "Ms. Thomas testified that [Appellant] knocked on at least one door. [The Victim] testified that he did not see where [Appellant] went." Appellant's Brief, at 19.

Appellant's claim arises out of the following remarks by the prosecutor, which he believes are not consistent with Ms. Thomas' and the Victim's actual testimony:

> [The Victim] and [Ms. Thomas] both said that after he got stabbed, [the Victim] said he walked away, he wasn't knocking on no doors. He walked away, he returned, he looked like he was going to hit me again, knocked me out of the way and [said]: let's get the fuck out of here.
>
> [Appellant] says he was knocking on doors asking for help. There's a line from Macbeth, Macbeth was asked like: why did you act in a certain way that you did – this is from Macbeth – the guy answered: "Who can be wise, amazed, temperate and furious, [l]oyal and neutral in the moment?" No man. You can't have conflicted emotions like that. You can't tell me you're stabbing a guy with a knife and a second later you're

- 19 -

(demonstrating knocking) – let's get help for this guy. That's BS. Nobody does that. What he did was walk around – [the Victim] said: I thought he was trying to ditch the knife someplace. He came back, walked around, comes back, maybe he didn't want to be seen over there where the body was going to be, comes back and he flees the scene. That's evidence of guilt.

N.T. (closing arguments), 9/17/13, at 31.

It is well established that a prosecutor is free to argue that the evidence leads to guilt and is permitted to suggest all favorable and reasonable inferences that arise from the evidence. A prosecutor also may argue his case with logical force and vigor. Additionally, a trial court's decision not to grant a new trial based on prosecutorial misconduct will not be reversed on appeal absent an abuse of discretion.

*Commonwealth v. Rios*, 684 A.2d 1025, 1032-33 (Pa. 1996) (internal citations omitted).

The trial court indicates that it did not find the prosecutor's closing remarks as having mischaracterized the testimony of the Victim or Ms. Thomas. The court states:

As the record demonstrates, there was no mischaracterization of the evidence. Ms. Thomas testified that [Appellant] knocked on Breann Watts' door before leaving the scene with Ms. Chandler. However, there was no testimony by Ms. Thomas demonstrating that [Appellant] knocked on her neighbor's door in order to get help for the Victim. In fact, Ms. Thomas testified, "they just stabbed him and left him to bleed to death on my stoop."

Nevertheless, the [t]rial [c]ourt asserts that any mischaracterization of the testimony was an inadvertent misstatement of fact. The effect of the prosecutor's argument was to respond to the [d]efense's closing argument. Since the defense had vigorously attempted to show [Appellant]'s lack of intent to kill, the prosecutor's argument was appropriate and by no means was calculated to inflame the jury or to deny [Appellant] his right to a fair trial. Moreover, the [t]rial [c]ourt

> instructed the jury that counsel's recollection of the facts is not binding on the jury.

TCO, at 18-19.

We agree with the trial court's analysis. Furthermore, the prosecutor's remarks did not, as Appellant claims, affirmatively assert that the Victim or Ms. Thomas had specifically testified that Appellant did not knock on any doors. With regard to Ms. Thomas, it seems as if the prosecutor began by speaking about the testimony of the Victim *and* Ms. Thomas, but then quickly constrained his comment to focus exclusively on the Victim's testimony. Thus, it does not appear that the prosecutor made any specific assertion about Ms. Thomas' testimony at all in the passage cited by Appellant. And, while the Victim did not specifically or literally testify that Appellant did not knock on any doors, his testimony can be fairly interpreted as supporting that factual conclusion by omission. The Victim testified that he observed Appellant's actions after the stabbing, and he did not mention Appellant's knocking on any doors before he eventually fled the scene. Thus, the factual premise of Appellant's fifth claim lacks a foundation in the record. For this reason, and the reasons set forth by the trial court, Appellant's fifth claim is meritless.

### *Prosecutorial misconduct during closing argument – mischaracterization of defense arguments*

Next, Appellant asserts that prosecutorial misconduct occurred when the prosecutor ostensibly mischaracterized the defense's closing argument

as having stated that Appellant would be innocent of homicide if the victim had died. Appellant argues:

> In his closing argument, the prosecutor stated[,] "Suppose somebody didn't answer and he died there. If you're following [defense counsel's] logic then, he didn't commit homicide, because I didn't mean to do it. That's silly." This statement mischaracterized [d]efense [c]ounsel's argument and misstates the law. If [Appellant] had killed [the Victim] without the specific intent to kill, then he would be innocent of first degree murder. He would not necessarily be innocent of homicide and [d]efense [c]ounsel never posited that he would.
>
> After this incorrect description of the law, the jury would be reasonable in believing that [d]efense [c]ounsel's argument was ludicrous. If the jury believed that a specific intent to kill had not been proven, they should have found [Appellant] not guilty of attempted homicide. By confusing the jury about the elements of the offense, the prosecutor usurped the criminal process and may have fooled the jury into following his fictional characterization of the law. A specific corrective instruction was necessary to fix this error, but was not given. This error prejudiced [Appellant] and warrants a reversal.

Appellant's Brief, at 20.

The trial court's opinion may be read to suggest that it found the prosecutor's remarks to be a fair response to defense counsel's assertions during Appellant's closing argument. *See Commonwealth v. Trivigno*, 750 A.2d 243, 249 (Pa. 2000) (plurality opinion) ("A remark by a prosecutor, otherwise improper, may be appropriate if it is in fair response to the argument and comment of defense counsel.") (citing *United States v. Robinson*, 485 U.S. 25, 31 (1988)); *Commonwealth v. Marrero*, 687 A.2d 1102, 1109 (Pa. 1996). In any event, the trial court found that remark did not "interfere[] with the jury's fair and impartial assessment of the

evidence" and "did not affect the jury's ability to render a true verdict." TCO, at 19. We agree that there is no merit to Appellant's claim.

We do not ascertain anything improper regarding the prosecutor's statements that would even require invocation of the "fair response" doctrine. It is not at all obvious from the record that the prosecutor was attempting to describe the law; instead, it appears as if the prosecutor was commenting on the credibility of the defense's position that Appellant lacked the specific intent to kill when Appellant, unprovoked, had used a knife to stab the victim in the chest, and then subsequently failed to render any aid. Appellant's argument is a red herring, suggesting that the prosecutor's remark was making a statement about the law rather than an interpretation of the facts. To the contrary, the prosecutor's remark does not appear to describe the legal theory of the defense as "silly" at all.[5] Rather, the prosecutor's remark appears to have labeled "silly" the defense's interpretation of the facts as supporting that legal defense. The prosecutor's remark was made immediately after a summary of several facts that supported the conclusion that Appellant had failed to render aid to the Victim whom Appellant had just stabbed, N.T. (closing arguments), 9/17/13, at 25-

---

[5] The defense's legal theory being that lack of specific intent to kill precludes a conviction for attempted murder. It is not disputed that "[f]or a defendant to be found guilty of attempted murder, the Commonwealth must establish specific intent to kill." **Commonwealth v. Geathers**, 847 A.2d 730, 734 (Pa. Super. 2004).

- 23 -

26, and soon after the prosecutor's critique of Appellant's self-serving testimony, *id.* at 24-25. Accordingly, we ascertain no improper argument by the prosecutor. As such, Appellant's claim lacks merit.

### *Deadly weapon instruction*

Appellant's penultimate claim is that the trial court erred in regard to its issuing of an instruction regarding allowable inferences from Appellant's use of a deadly weapon. Appellant's claim and argument, in their entirety, are as follows:

> 7. The Court made reversible error in giving the jury the instruction that there was no question that they could apply the inference of specific intent, with regard to attempted homicide, because a deadly weapon had been used on a vital part of the victim's body.
>
> The United States Supreme Court recently held that[,] "Any fact that, by law, increases the penalty for a crime is an 'element' that must be submitted to the jury and found beyond a reasonable doubt." *Alleyne v. United States*, 133 S. Ct. 2151, 2155 (2013). In his instruction to the jury, the Judge explained that he had already made that finding of fact, implying that it would be improper for them to decide otherwise. This instruction may have caused the jury to rule in favor of the Commonwealth on vital questions such as intent and sentencing enhancements. It was improper for the Court to remove these factual determinations from the jury and should result in a reversal.

Appellant's Brief, at 21.

Appellant's argument contains no citation to the record wherein the alleged error occurred and/or where this claim was preserved in the trial court. On this basis alone, we could deem Appellant's issue waived. *See Commonwealth v. Rozanski*, 433 A.2d 1382, 1390 (Pa. Super. 1981)

(finding an "objection has been waived [where the] appellant has failed to cite to the record, advising us either at what point in the trial the [error] occurred, or in what manner his objection was preserved for appellate review").

Nevertheless, we ascertain no error in the trial court's instruction. The jury was instructed as follows:

> When deciding whether [Appellant] had the specific intent to kill, you should consider all the evidence regarding his words and conduct and the attending circumstances that may show his state of mind.
>
> If you believe [Appellant] intentionally used a deadly weapon on a vital part of the victim's body, you may regard that as an item of circumstantial evidence which may, if you choose, infer that [Appellant] had the specific intent to kill. Again, a deadly weapon is any firearm, whether loaded or unloaded, any device designed as a weapon and capable of producing death or serious bodily injury or any other device or instrumentality [*sic*] that in the manner in which it was used or intended to be used is calculated or likely to produce death or serious bodily injury. In this case, as you heard, [Appellant] admitted using a knife. I don't think there's any question that is a deadly weapon and also that the victim was stabbed in the lung, which is also [*sic*] a vital part of the victim's body.

N.T., 9/16/13-9/19/13, at 295-96.

It is well-established that "[t]he specific intent to kill … may be inferred from the intentional use of a deadly weapon on a vital part of the body of another human being." *Commonwealth v. Ewing*, 264 A.2d 661, 663 (Pa. 1970) (internal quotation marks and citations omitted) (hereinafter, "deadly weapon presumption"). The trial court's instruction properly conveyed this principle.

- 25 -

Furthermore, there is nothing in the trial court's elaboration on the deadly weapon presumption that was improper. As the record plainly reveals, the court did not, as Appellant contends, instruct the jury that "there was no question that they could apply the inference of specific intent" from the use of a deadly weapon. Appellant's Brief, at 21. The trial court properly instructed the jury that the choice to apply the deadly weapon presumption was theirs to make. **See** N.T., 9/16/13-9/19/13, at 295 ("If you believe [Appellant] intentionally used a deadly weapon on a vital part of the victim's body, you **may** regard that as an item of circumstantial evidence which **may**, **if you choose**, infer that [Appellant] had the specific intent to kill.") (emphasis added).

Moreover, although the court instructed the jury that a knife is a deadly weapon and that a lung is a vital part of the Victim's body, Appellant does not even dispute either of those facts. Indeed, those facts are virtually self-evident. Regardless, the trial court did not tell the jury that Appellant acted intentionally (which was an element of the deadly weapon presumption as recited by the court), nor did the trial court tell the jury that they *must* apply the deadly weapon presumption given the undisputed facts. Accordingly, even if Appellant had not waived this claim, it clearly lacks merit.

### *Evidence admitted during sentencing proceedings*

Finally, Appellant argues that the trial court erred when it permitted video evidence during the sentencing phase of his trial showing Appellant

engaged in an altercation at the jail. Essentially, Appellant contends that the evidence was not relevant to his sentencing for attempted murder because the altercation occurred after his conviction. However, Appellant fails to cite any relevant case law or other legal authority in support of his claim that this evidence was irrelevant to the formulation of his sentence and, thus, his argument is meritless on that basis alone. Nevertheless, we believe such evidence was clearly relevant to assess Appellant's rehabilitative needs and/or the protection of the public, both of which are not just relevant concerns at sentencing, but are matters which the sentencing court is required to consider. *See Commonwealth v. Fullin*, 892 A.2d 843, 847-48 (Pa. Super. 2006) ("When imposing a sentence, the sentencing court *must* consider the factors set out in 42 Pa.C.S.A. § 9721(b), that is, *the protection of the public*, [the] gravity of offense in relation to impact on victim and community, and [*the*] *rehabilitative needs of the defendant*....") (emphasis added, internal quotation marks and citation omitted). Accordingly, Appellant's final claim is meritless.

Judgment of sentence *affirmed*.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 2/5/2016

- 27 -